



**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

FEB 1 3 2006

CLERK, U.S. DISTRICT COURT
By _____
　　　　　**Deputy**

| | |
|---|---|
| **SUPER FUTURE EQUITIES, INC.** §<br>*Plaintiff,* §<br>**vs.** §<br> §<br>**WELLS FARGO BANK, N.A..,** §<br>*as Trustee of the Certificate Holders of the* §<br>*Merrill Lynch Mortgage Investors CMBS* §<br>*Pass Through Certificates Series 1999-C1,* §<br>**ORIX CAPITAL MARKETS, LLC, ORIX** §<br>**CAPITAL MARKETS PARTNERSHIP,** §<br>**JOHN DINAN, MICHAEL F. WURST,** §<br>**CLIFFORD WEINER, and JAMES R.** §<br>**THOMPSON,** §<br>　　　　*Defendants.* §. | C. A. No.<br>**3 - 0 6   CV - 0 2 7 1/B** |

## PLAINTIFF'S ORIGINAL COMPLAINT - CLASS ACTION

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW SUPER FUTURES EQUITIES, INC. ("Plaintiff") and files this its original complaint, respectfully showing as follows:

### I. JURISDICTION

1.　　This Court has jurisdiction pursuant to 18 U.S.C. § 1964(c); and 28 U.S.C. § 1332(d)(2).

### II. VENUE

2.　　Venue is proper in the Northern District of Texas pursuant to 18 U.S.C § 1965 (a); and 28 U.S.C. § 1391(b).

## III. PARTIES

**Plaintiff:**

3.      Plaintiff Super Future Equities, Inc., ("Plaintiff"), a Nevada Corporation with its principal place of business in the State of Texas.

**Defendants:**

4.      Defendant Orix Capital Markets LLC , ("Orix") is Delaware Corporation, with its principal place of business in Dallas, Texas.  Orix may be served with process by serving its registered agent for service, CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.

5.      Defendant Wells Fargo Bank, N.A. ("Wells Fargo")(Formerly Wells Fargo Bank Minnesota, N.A.), has its principal place of business in Sioux Falls, North Dakota, and the State named in its Certificate is not Texas.  Wells Fargo may be served with process by serving its Vice President, Jack A. Aini, at its Corporate Trust Services, 9062 Old America Road, Columbia, MD 21045-1951.

6.      Defendant John Dinan ("Dinan"), an individual residing in Texas, may be served with process at his place of business, Orix Capital Markets, LLC. 1717 Main St., Suite 900, Dallas, Texas 75201.

7.      Defendant Michael F. Wurst ("Wurst"), an individual residing in California, may be served with process at his place of business, Concierge Asset Management, 2900 Paradise Drive, Tiburon, California 94920.

8.      Defendant Clifford Weiner ("Weiner"), an individual residing in Texas, may be served with process at his place of business, Orix Capital Markets, LLC. 1717 Main St., Suite 900, Dallas, Texas 75201.

9.      Defendant James R. Thompson ("Thompson"), an individual residing in Texas, may be served with process at his place of business, Orix Capital Markets, LLC. 1717 Main St., Suite 900, Dallas, Texas 75201.

10.     Orix Capital Markets Partnership (the "Partnership"), believed to be a Texas Partnership with its principal place of business in Dallas, Texas, may be served with process by serving one of its partners, John Dinan at Orix Capital Markets, LLC, 1717 Main Street, Suite 900, Dallas, Texas 75201.

## IV. NATURE OF THE ACTION

11.     This case arises from Orix's and Wells Fargo's egregious and ongoing breaches of contractual and fiduciary obligations as "Special Servicer" and Trustee, respectively, of certain mortgage loans pooled together in a trust fund.  Both Orix and Wells Fargo have devised business plans to reap millions of dollars in profits, at the expense of other investors in the trust fund.

## V. FACTS

### Commercial Mortgage Backed Securities

#### A.   General Background

12.     Commercial Mortgage Backed Securities ("CMBS") are debt instruments or bonds secured by real estate mortgages.  To create mortgage backed securities, a group of mortgages is assembled into a pool, transferred into a trust, securitized, and marketed to investors as "pieces" of the pool or "Certificates" (bonds, actually) representing interests in the trust's pool of mortgages. The investors, or "Certificateholders," like Treasury bond investors, receive monthly interest payments and are promised the return of their full investment capital at the maturity of the CMBS certificates.  This maturity coincides with the (balloon payment) term of the underlying mortgages

in the CMBS trust pool.  The CMBS business is a trillion dollars a year industry, and growing.

CMBS Certificates viewed as conservative investments in the financial world.  Retirement funds,

pension funds, and other fixed income funds are the typical purchasers of CMBS.

## The Participants in a Securitization



13.    The parties to CMBS are usually (1) the Real Estate Borrowers of the Mortgage

Loans, (2) the Mortgage Loan Sellers, who assign the Mortgage Loans to (3) the Depositor who

collects and securitizes the Mortgage Loans, and in turns assigns them  to (4) a Trustee, who holds

legal title to the loans for the benefit of the Certificateholders; (5) the Underwriter, who markets and

sells the Certificates at public as well as private offerings; (6) the Certificateholders who purchase

the bonds; (7) the "Servicer," (or "Master Servicer"), who is responsible for servicing all of the

performing loans in the pool (i.e. receiving payments from the borrowers, depositing income into

the Trust accounts, arranging  timely distributions of cash payments to the Certificateholders, and

-4-

making any required advances or payments that the Servicer or Trustee fails to make); and (8) the "Special Servicer," who is responsible for servicing loans which are in default or in imminent risk of default. One of the Special Servicer's duties is to work with troubled borrowers so that they may continue making payments on their loans.

14.    With the cooperation of all participants, and in compliance with the Securities Act of 1933, 15 U.S.C. § 77a *et. seq.*, as amended, the Depositor files a disclosure Statement with the Securities and Exchange Commission ("SEC"), of which the Prospectus given to all investors forms a part. The Prospectus is available to all persons who wish to purchase Certificates.

15.    In addition to the representations and disclosures contained in the Prospectus, the investors are supposed to be protected by the checks and balances set forth in painstaking detail in the "Pooling and Servicing Agreement" ("PSA"), by and between the (1) "Depositor," (2) "Servicer," (3) Special Servicer and (4) Trustee. The PSA sets forth procedures and criteria to



ensure the benefit of the Certificateholders through smooth servicing of the mortgaged loans and distribution of proceeds through the trust.

16.     As debt securities, the Certificates are rated by independent third parties (professional rating agencies, including Fitch, Standard & Poor' s ("S&P") and Moody's Investor Service) in accordance with the risk involved in the investment. Broken down into series reflecting the varying levels of risk and rate of return, the Certificates, are sold at private and public offerings. The publicly sold Certificates usually rate between AAA to BBB– at the time of issuance. The ratings of the privately offered certificates range from BB+ to unrated. Only limited and "sophisticated" investors are invited to bid at private offerings.



17.     Class "A" Certificates, represent the most solid investment (i.e., least amount of risk), are entitled to the first payments from the borrowers at the designated coupon rate and, as a result, command a higher price and pay a lesser interest. Holders of the lowest series Certificates, known as "B- Pieces" or "first loss," receive payments only after all other certificates are paid. This lower class of certificates bears higher risks, including risks of more defaults than anticipated, risks

-6-

that the value of the collateral securing the defaulted loans will be less than anticipated, and risk regarding timing and number of prepayments. In other words, the lowest class of certificates involve a "first-loss" risk. To compensate for the heightened risks, the lowest certificates are sold at the greatest discount to face value (par) and receive the highest interests.

18.     Any entity that owns the majority of the "B-Piece" Certificates is known as the "Controlling Class." As a rule, to further compensate for the "first-loss" risk, the Controlling Class has the right to appoint the Special Servicer. As loans default and other risks materialize, such that funds received from borrowers are insufficient to make principal and interest distributions to the lowest "B-Pieces," the unpaid "B-Pieces" are "junked." In manner, one class or "tranche" at a time is eliminated. After each elimination, the next lowest class of Certificates assumes the "first-loss" risk, becomes the "Controlling Class" and is entitled to designate the Special Servicer of its choice.

19.     The "Servicer" and "Special Servicer" have different duties and are compensated differently, although both are fiduciaries of the Trust and Certificateholders. Collection of monies from borrowers, distribution of principal and interest payments to Certificateholders and communications with borrowers are tasks performed exclusively by the Servicer, except under very limited circumstances. Customarily, a loan is only transferred to Special Servicing upon some "event of default."

20.     The Special Servicer's fiduciary responsibilities to the Certificateholders include the "work-out" of problem loans (i.e. working out solutions to ensure the performance of loans in risk of failure and the return same back to the Servicer as performing loans). Because the only benefit the Certificateholders receive is the principal and interest payments that the borrowers make, the Special Servicer is under a duty to make all reasonable efforts to get troubled borrowers back in a

stable financial position so as to enable such troubled borrowers to resume their monthly principal and interest payments.

21.     Properly serviced CMBS should, and actually do, work like well-oiled machines. Trustees and Servicers act in the best interest of all Certificateholders and receive, for their labors, the respective percentages of the pool's value as set forth in the Prospectus and PSA; the Servicer receives a percentage of value of the loans within the pool, and the Special Servicer, receives a higher percentage of the value of the loans in special servicing. Because Special Service fees run many times higher than regular servicing, the Prospectus and PSA set forth the particular events that trigger placement of loans into special servicing and the procedures therefor. The Special Servicer is duty bound to endeavor to work out solutions for problem loans and to return same back to the Servicer as soon as possible.   If work out fails, as a last resort, the Special Servicer, with approval of the Controlling Class, forecloses the loan in the way most economical for the Certificateholders.



Exhibit 1: Total CMBS Delinquency Trends

22.     Statistics show that, at any given time, CMBS usually have approximately 2 % of the pooled loans in "special servicing," (delinquent) of which all but a fraction are "worked out," i.e.,

the problem is solved, foreclosure is avoided and the mortgage is returned to regular servicing. Furthermore, as long as the borrower is making timely principal and interest payments, most Servicers would not transfer the loan to Special Servicing. Where Wells Fargo and Orix combine as Trustee and Servicer, statistics show that nearly 30% of the loans in the pool end up in Special Servicing (Delinquency rate). MLMI4 CMBS's statistic further show that the default rate for CMBS loans is approximately 2 to 3% of the mortgaged pool over the term of the life of the Trust. The default rate from the combination of Wells Fargo as Trustee and Orix as Special Servicer can be as high as 20% as evidence by the MLMI Trust, which is the subject of this litigation.

23.     The Servicer and Special Servicer are hired to serve and assist borrowers in the performance of their obligations under the mortgaged loans, to safeguard the Certificateholders'



**MLMI1999-C1 Foreclosures**

principal investment, and  to collect and distribute the promised monthly income.The Special Servicer is never to place its ownership interests before the interest of any other Certificateholders



in the Trust. To do so is improper, violates the Servicing Standard set forth in the PSA, is unethical, constitutes a breach of the Special Servicer's fiduciary duty, and may be illegal.

## B. Orix/Wells Fargo CMBS

24.     Unfortunately, placing its own interests before that of the Trust and other Certificateholders is exactly what Orix, as Special Servicer, has done in the present case, as well as in other Trusts in which Orix has acted in the same capacity. Orix has systematically disabled the CMBS's control structure, which is precisely designed to prevent unilateral control over the mortgaged loans by any single player. As a rule, PSAs impose fiduciary duties on the Servicers towards the Trust and *all* of the Certificateholders. Despite such fiduciary duties, Orix has devised several schemes to increase its own revenues, not only at the expense of the Trust and Certificateholders; but also at the expense of Borrowers, Depositors and the Internal Revenue Service.

25.     If not originally designated as Servicer *and* Special Servicer, Orix covertly purchases "B" Pieces of certain "targeted" Trusts at highly discounted prices, in order to gain "Controlling Class" privileges. Thereafter, using its Controlling Class status, Orix appoints and/or maintains itself as Sevicer *and* Special Servicer.

26.     Because all Special Servicer duties command higher fees, it is in the best interest of the Certificateholders and the Trust to have different and unrelated entities as Master and Special Servicer. Identity of Servicer and Special Servicer provides too much opportunity to transfer performing loans to Special Servicing in order to quadruple the servicing fees. Identity of Servicer and Special Servicer creates an inherent conflict of interest likely to subject Certificateholders to excessive servicing fees.

27.    Fitch Ratings, an enterprise that evaluates and rates Special Servicers in American CMBS, recently noted that Special Servicers are subject to substantial conflicts of interest and that opportunistic servicing could cause an adverse impact on a Special Servicer's rating where

> a special servicer, based on its role in the transaction, creates self-serving revenue-garnering opportunities through excessive litigation, and/or opportunistic servicing by unnecessarily transferring assets into special servicing.... Fitch has concerns when the interpretations of documents benefit the special servicer only, allowing them to take no risk with their own capital and potentially creating expenses to the Trust.

*See* Business Wire Release, September 24, 2003. Such is exactly Orix's *modus operandi.*

**(1) Orix's Business Plan**

28.    Orix's pattern of initiating litigation against mortgage loan sellers (including Wachovia, Lehman Brothers, Bank of America, Nomura, Solomon Brothers, Artesia and UBS), has revealed that Orix's motives and "business plan" are designed to further its own interests as a "B-Piece" investor at the expense of the Trust and the more senior Certificateholders.

29.    In 2002 Orix expanded its business activities from those of a mere loan servicer to those of a market manipulator and unscrupulous "litigation machine." Orix's sole purpose is to pad its own and certain of its employees' pockets at the expense of unsuspecting and unfortunate Borrowers, Depositors, Certificateholders, and taxpayers.

30.    To this effect, Orix created a Portfolio Management and Surveillance Department ("Surveillance Department") separate and apart from Orix's Servicing Department. The Surveillance Department, is managed by attorneys Cliff Weiner, John Dinan, and Michael F. Wurst whose sole purpose was to enrich Orix (and themselves) without regard to the fiduciary duties owed to all Certificateholders. All of the loans in all of the pools in which Orix had a financial interest (i.e. those in which Orix owned "B-Pieces") were transferred to the Surveillance Department.

31.     In addition, as an incentive for certain officers and employees to destroy borrowers and extort money from Depositors, Orix set up a furtive Partnership to allow such officers and employees to participate in Orix's profits. See testimony of Michael F. Wurst, taken January 14, 2004, pp.182-93, attached hereto as Exhibit "A." The sole purpose of the Partnership is to create an incentive for key Orix employees to breach their fiduciary duty to the Trust and the Certificateholders and to pad their own pockets, along with the coffers of Orix. After the advent of the Partnership, the more profit Orix made, the bigger the pot of money in the Partnership, and the richer those select employees became. This Partnership was not disclosed to investors or prospective Certificateholders in any document. In addition, the existence of such Partnership has never been disclosed to the SEC in any 10-K report. See SEC Filing ¶ 119.

32.     The Partnership, which is limited to approximately 25 key employees of Orix and Orix US, Inc. ("Orix US"), required no capital contribution. The partnership allows Thompson (current President/CEO of Orix US, and former CEO of Orix, the principal subsidiary of Orix USA), Weiner, Dinan (Director of Orix's Special Servicing) and Wurst (former Director of Distressed and Proprietary Assets and in charge of all litigation) to share side by side with Orix in, among other things, the profits realized by Orix from its B-Piece Certificates, foreclosure fees, sale of foreclosed properties, and interest paid on monies advanced to the various Trusts. In addition, partners are permitted to invest additional pre-tax monies from their salaries and bonuses into the Partnership to increase their percentages interest therein. Every April, 30, profits of the Partnership are distributed to the partners.

33.     In addition to handsome salaries, Orix paid Weiner, Dinan and Wurst very healthy bonuses. In 2003, Dinan and Wurst each received salaries of $150,000 and additional bonuses of

-12-

$600,000. Upon information and belief, Weiner's salary and bonus were even larger. Wurst invested 60% of his compensation in the Partnership. Orix, Thompson, Weiner, Dinan, and Wurst shall be hereinafter collectively referred to as the "Orix Conspirators."

34. After the inception of the Partnership, the Orix Conspirators refined Orix's business plan to include forcing the Depositors to produce all "origination documents" related to the initial underwriting of the loans, regardless of whether the loan is performing and regardless of whether Orix actually needs those documents to service the loan. Under PSAs and other controlling agreements, Depositors are not obligated to keep, much less deliver, such documents; nevertheless,



Orix demands them and threatens to file suit if not voluntarily produced. When produced, Orix combs through the origination files in search of some "technical" basis as to why otherwise performing loans should not have been in the Trust pool. Next Orix, contacts the Depositor to drop hints about "some problems" with "certain loans," based upon its review of the loan origination documents. In the next breath, Orix advises the depositor that if the Depositor were to purchase Orix's "B-Pieces" at par value, the "problem loans" would no longer be an issue. Orix would realize

-13-

an obscene profit on any such sale, given that it purchased some "B-Pieces" for as little as eight cents ($0.08) on the dollar.

35.     When the depositor refuses to purchase Orix's "B-Pieces," Orix threatens to file suit on behalf of the Trust for alleged breaches of warranties and representations in the loan origination documents of certain loans in the pool. Orix ultimately files suit, all at the expense of the Trust and the other Certificateholders, who reimburse Orix for all litigation expenses, plus interest. Orix has found a virtually bottomless war chest to carry out its threats.

**(2) How the Scams Work**

**a. First Scam (Buy Our "B-Pieces" or We Will Sue You)**

36.     The Orix Conspirators target certain CMBS Trusts with the idea of purchasing the "B-Pieces." They conduct a through due diligence of the loans in the pool which includes reviewing files related to the loans in the Trust, reviewing and conducting site inspections for many of the loans, performing internal reviews of all transactional documents, contacting borrowers, etc. See See Orix's internal documents Bate stamped OCM273648-81 attached hereto as Exhibit "B." By the time the Orix Conspirators make a decision to purchase "B-Pieces," they are intimately familiar with many, if not most, of the loans in the pool and the risks involved in purchasing the pool's "B-Piece" Certificates.

37.     All "B-Pieces" that the Orix Conspirators purchase are bought at a "discount to coupon," for considerably less than face value and in amounts sufficient to enable them to constitute the pool's "Controlling Class," with its inherent right to appoint Orix (themselves) as the Special Servicer for the Trust and dictate all Special Servicing actions.

38.     As Special Servicer, the Orix Conspirators demand all loan origination documents from the Depositors for all loans in the Trust's pool, regardless of the loans' performance. Conventional loan origination documents contain private and confidential information about the borrower, to which a servicer is not entitled.   If the Depositors resist production, the Orix Conspirators, threaten to initiate litigation in order to enforce the production of such documents in violation of the borrower's right to privacy.

39.     Once the Orix Conspirators obtain the loan origination documents, they scour them in search of technical defects such as rent roll discrepancies, pending local code violations, failure to obtain pool permits, failure to comply with handicap ordinances, or other routine management issues, which have nothing to do with the performance of the mortgage loan but, which the Orix Conspirators argue to Depositors as being "problem loans."

40.     Thereafter, the Orix Conspirators approach the Depositors alleging that certain loans contributed to the pool by the Depositor are problem loans because they contain technical breaches of warranties and misrepresentations. The Orix conspirators suggest that the solution to the alleged problem loans is the Depositor purchase of Orix Conspirator's "B-Pieces" at face value (not the substantially discounted rate paid therefor). In the event of a refusal, the Orix Conspirators threaten to sue the Depositor for such contrived misrepresentations and breaches of warranty, seeking repurchase of the loans, many of which are performing loans.   If the Depositors refuse, the Orix Conspirators file suit against the Depositor "on behalf of the Trust and Certificateholders," although the lawsuit cannot conceivably benefit the Trust or the Certificateholders.

41.     A Depositor knows that where there is a determination of misrepresentations with respect to the loans it contributed, or where it repurchases loans, the Depositor would effectively be

-15-

precluded from participating in future CMBS pools because its CMBS credibility and rating would be substantially compromised. Through "Rambo" litigation tactics, the Orix Conspirators force the Depositors to expend huge sums of money to defend the frivolous lawsuit and risk their CMBS future, or bow to the extortion and settle out of court. Orix enjoys the reputation of an "enforcer" and wants other Depositors to know that if they too refuse to purchase Orix's "B-Pieces" they too will be subjected to the wrath of Orix, whose official company motto is "Just Pay." The Orix Conspirators employ a very aggressive and expensive style of litigation, often incurring needless litigation costs, all of which are ultimately paid by the Certificateholders. While Orix may "advance" monies to cover the litigation expenses, the Trust repays all advances to Orix *plus interest* before any distributions are made to the Certificateholders.

42.    If a settlement is reached with the Depositors, "on behalf of the Trust," the "Settlement Proceeds" are rarely, if ever, enough to cover the "litigation costs" incurred by the Orix Conspirators. In this connection, said Settlement Proceeds are chamaeleon like in their nature, changing according to the varying objectives of the Orix Conspirators. Where Orix obtains a judgment against a borrower and the borrower requests a credit on the judgment, the Settlement Proceeds are classified as "breach of contract" thus the borrower gets no credit therefrom. When it comes time to pay income taxes, the Orix conspirators re-classify the Settlement Proceeds as "liquidation proceeds" so as to avoid federal tax liability under "REMIC" (Real Estate Mortgage Investment Conduit), 26 U.S.C. §§ 860A-G. Orix has found a way to get around the IRS.

43.    The Orix Conspirators virtually always claim that the costs of litigation exceed the amount of the settlement. Thus, the Trust and the Certificateholders never "win." Not only do the Certificateholders never see a penny of the settlement proceeds, but are assessed additional monies

to make up for the Orix Conspirator's scorched earth litigation tactics. Furthermore, the settlement proceeds are paid directly to Orix and placed in its operational account. The proceeds are not paid to the Trust, although ettlement monies are owed to the Trust and Certificateholders, not to Orix.

44.    Orix and Wells Fargo have received settlements of approximately $50 Million from lawsuits various Depositors, including Bank of America, Lehmann Brothers and UBS Warberg. To this date none of this money has made it into their respective Trusts.

**(b)  Second Scam (Keep our "B-Pieces" Alive)**

45.    Again, this scam works only with respect to loan pools in which the Orix Conspirators are the "Controlling Class." The Orix Conspirators go through the loan origination documents targeting foreign or minority borrowers with high equity loans and scour said loans for technical defects. The Conspirators then obtain artificially low appraisals, known as "Broken Price Opinions," to understate the value of the mortgaged properties (despite knowing that their value is considerably more), and target the loans for foreclosure regardless of whether they are performing loans. The technical defects range from minor loan application errors or omissions such as minor maintenance issues or disagreements with the servicer. The low appraisal value is yet another excuse to seize the borrower's property.

46.    Thereafter, Orix as Servicer sends the loan with such "engineered" and "technical" defects to Orix for Special Serving, where all sorts of unauthorized (not authorized under the loan documents) "miscellaneous" fees and other charges are assessed monthly against the unsuspecting Borrower. When the Borrower complains, Orix labels the fees and other charges as a "mistake," and erases the overcharges from the monthly statement. Or so the Borrower is told. Only Orix knows that any failure to pay any fees or other charges assessed against the Borrower forever remains as an

"event of default" within the loan's performance history, unbeknownst to all but the Orix Conspirators.

47.    In addition, instead of attempting to "workout" the loan and transfer it back to regular servicing, the Orix Conspirators place unreasonable demands on the Borrower (such as a tenfold increase in the reserve for replacement payments), in order to ensure the Borrower's inability to cope with the mortgage payment, the added fees, and the outrageous additional reserve demands.

48.    When the borrower is no longer able to cope with the added burdens imposed by the Special Servicer, the Orix Conspirators initiate foreclosure proceedings on the property, ostensibly "*on behalf of the Trust and the Certificateholders*." More often than not, the Orix Conspirators prevail due to foreigners' and minority borrowers' lack of understanding of the judicial system and their unwillingness or inability to spend huge amounts of money to adequately defend themselves.

49.    At the time of foreclosure, both Orix and Wells Fargo receive foreclosure fees in addition to all the other fees collected from the Certificateholders.

50.    After foreclosure, when the borrowers are no longer making payments on the loans, the Orix Conspirators make "advances" to the Trust for those absent principal and interest payments. In addition, the Orix Conspirators make "servicing advances," which include legal fees spent by Orix to pursue claims against the borrowers. All of these "advances," as well as the interest thereon, are ultimately paid by the Certificateholders.

51.    The Orix Conspirators make all the foregoing "advances" to the Trust not for the benefit of the Trust or the other Certificateholders, but only in order to maintain their "Controlling Class" status within the Trust. This, in turn, entitles the Orix Conspirators (1) to continue to receive interest payments on their "B-Piece" ("first loss") investments, which would have been "junked,"

but for the advances; and (2) to maintain its Special Servicer status (i.e., keep receiving servicing and special servicing fees), which in turn enables the Orix Conspirators to maintain the right to approve special servicing actions, thus fuel its litigation expenses in furtherance of the First Scam.

52.    The advances, for which the Trust and Certificateholders ultimately pay, are purely for the benefit of the Orix Conspirators and, in fact, wholly detrimental to the interest of the



Certificate-holders and the Trust. In essence, Orix is making advances to the Trust in order to enable the Trust to pay Orix's interest on its "B-Pieces," all at the expense of the Trust and Certificateholders.

53.    Orix is a servicer of loans. According to its annual statement, Orix services loan pools worth approximately 40 billion dollars. Assuming that Orix acts exclusively as Special Servicer (and not also as Servicer) with respect to each and every loan, one would expect Orix to generate annual revenues of $100 Million (Special Servicing Fee: .25% of $40 billion [value of the mortgaged pools]). Yet, according to Orix's annual statement, Orix made $1.2 Billion in 2004!

**D. Orix's Scams at Work**

54.     The "La Salle" case is a good example of how things go amiss where Orix gets involved in CBMS.  In 1997, Asset Securitization Corporation ("Asset") purchased a pool of mortgage loans (the "Pool") from Nomura Asset Capital Corporation ("Nomura") and transferred it to LaSalle National Bank ("LaSalle") as Trustee of a Trust pursuant to a PSA, between Asset as Depositor; LaSalle as Trustee; AMRESCO Services as Servicer; and Lend Lease Asset Management ("Lend Lease") as Special Servicer.

55.     After the default of a $50 million loan (the Doctors Loan), Lend Lease sued Asset and Nomura alleging the Doctor's Loan was not a "qualified mortgage" and improper underwriting, and demanding repurchase of the Doctors Loan.  Laser and Steed, holders of the lowest "B-Pieces" filed their own lawsuits alleging failure to disclose material information.  According to discovery documents on file, every fact that Laser and Steed alleged had been withheld from them was in fact disclosed to Laser and Steed as well as LaSalle.

56.     In March 2003, Orix approached Laser and Steed to purchase their "B-Pieces" which had a face value of $46 million, which Orix ultimately purchased for $3.5 million (eight cents on the dollar).  Shortly thereafter, Orix contacted Asset and Nomura  to discuss selling the "B-Pieces" to either or both of them. After Asset and Nomura  refused to repurchase Orix's "B-Pieces", Orix turned to other ways of making a substantial profit on its Certificates. As "Controlling Class" Orix ousted Lend Lease as Special Servicer, installed itself as Special Servicer and proceeded to pursue litigation in furtherance of its personal agenda, to the detriment of the other certificate holders.

57.     While Orix is separately reimbursed by the Trust for costs and expenses incurred in connection with judicial proceedings (plus interest), under the terms of the PSA, Orix was required

to "[p]ay all expenses incurred by it in connection with its *servicing* activities." Orix, however, developed a strategy whereby all costs associated with the *special servicing* of the Doctors Loan and others, were categorized as "legal" and, therefore completely reimbursed by the other Certificate-holders of the Trust.   Thus, the Trust became Orix's personal litigation war chest, while Orix continued to collect its Special Servicer fees as well as "B-Piece" investor distributions.

58.     Orix admitted in its "Doctors Hospital Exposure Summary" posted on its website on August 2003, that there were no "assurances that a successful resolution will be achieved" and that the "litigation could take years."   Nevertheless, Orix as Special Servicer and "Controlling Class," authorized virtually unlimited litigation expenditures.   In the Exposure Summary, Orix disclosed expenditures of more than $2.6 million in legal costs for the period March to July 2003, and predicted approximately $500,000 per month for the foreseeable future just for the Doctors Loan litigation alone.

59.     Thereafter, Orix fired the law firm of Akin Gump that had handled the case for two and one half years and  incurred an additional $2 million in fees for a period of approximately 4 months to get is new counsel up to speed on the facts.   Orix claimed that the action required "specialized litigation counsel" and hired McKool Smith, a Dallas, Texas, law firm, to take over the prosecution of the action in New York.  McKool Smith, had no New York office and incurred travel expenses for every court appearance in New York, as well as the added expense of local counsel. After McKool Smith was retained, an additional 20 depositions were taken outside of Texas (half in the New York area) which were attended by no less than 3 McKool Smith attorneys and additional McKool Smith support staff, all paid for by the Trust and ultimately the Certificateholders.

60.     The outrageous conduct of Orix is further exemplified by their efforts to demand that Asset and Nomura repurchase 15 mortgage loans in addition to the Doctor's Hospital Loan, 19 credit lease loans and every other loan in the D5 Trust. Orix made these demands notwithstanding that the great majority of these loans were not in default and, therefore, not subject to any "special servicing" by Orix under the PSA.

61.     At the expense of the Trust and Certificateholders, Orix contended that there were "defects" in the identified mortgage loans, because certain documents were allegedly missing from the Mortgage Files. However, pursuant to the PSA, the Trustee had 45 days from the receipt of each mortgage file to review its content and "promptly" notify Asset and/or Nomura of any absent documents, in writing, setting forth each affected mortgage loan and the nature of the defective or missing document. It was undisputed that LaSalle never gave notice to Asset or Nomura of any missing documents within the permitted time frame. Neither Asset nor Nomura had any obligation to produce the files demanded by Orix.

62.     After Asset and Nomura advised Orix's that its claims had no merit, Orix demanded that, in addition to the identified loans, Asset and/or Nomura either repurchase all the other loans or cure all other breaches within ninety (90) days although Orix had not specified any defects in any of the other loans. In fact, the vast majority of the loans were not even in special servicing. Nevertheless, and without explanation, Orix demanded that the entire pool of approximately $1.6 billion in mortgage loans be repurchased.

63.     Orix's strategy was simple! "Depositor, buy our "B-Pieces" at face (par) value or we institute litigation against you." After all, litigation costs Orix nothing; the Certificateholders pay for all of it. Due to Orix's self dealing, in July of 2003, Orix passed through to the Certificate-



holders $1.4 million in legal expenses related to its attempts to force a repurchase of the Doctors Hospital Loan. As a result, the Trust failed to meet its interest payments to the Certificateholders and all three rating agencies placed the Certificates rated AA and lower on rating watches. As of August 2003, the litigation fees had escalated to $2,628,573 and estimated by Orix to be in the range of $450,000 to $500,000 per month in the future. (See video of Michael Wurst regarding the LaSalle litigation found at http://wwworixcm.com/communic/news/readnews4.asp).

**E. Significance of REMIC**

64.    As a rule, CMBS Certificates are "pass through Certificates," i.e., the Trust has elected to be treated as a Real Estate Mortgage Investment Conduit ("REMIC") so as to enjoy the tax exempt status allowed under 15 U.S.C. §§806A-G. REMIC regulations impose very strict limitations as to the nature of the investments a REMIC trust may make (i.e. "permitted investments") and transactions in which it may not undertake (i.e. "prohibited transactions"). Any violation of REMIC regulations has significant tax implications for the Trust, as well as all Certificateholders. For example, any income realized by the Trust from a "prohibited transaction" is taxed at 100%. The REMIC regulations also provide that any entity that causes the REMIC regulations to be violated is liable to the Trust and the Certificateholders for the entire amount of the tax.

65.    Only income from "qualified mortgages" and "permitted investments" may enter a REMIC trust. A "qualified mortgage" is an obligation (i.e. mortgage) which is principally secured by an interest in real property which (1) was transferred to the Trust on the startup date, (2) was purchased by the REMIC Trust within 3 months after the startup date or (3) any qualified replacement mortgage.

-23-

66. Permitted investments are limited to:

    a. Cash Flow Investments (i.e. temporary investment where the Trust holds money it has received from qualified mortgages pending distribution to the Certificateholders);

    b. Qualified Reserve Assets (i.e. any *intangible* property which is held for investment and is part of a reasonably required reserve to provide for full payment of expenses of the REMIC or amounts due on regular interests in the event of defaults on qualified mortgages or lower than expected returns on cash flow investments. These investments are for very defined purposes and are to be passive in nature. They must be "reasonably required."

    c. Liquidation Proceeds from "foreclosed property" which is (need to check) and acquired in connection with the default or imminent default of a "qualified mortgage" held by the Trust.

67. In order to maintain the REMIC status, the Trustee and the Servicers must ensure that the REMIC receives no income from any asset that is not a "Qualified Mortgage" or a "Permitted Investment." 26 U.S.C. § 806F(a)(2)(B).

68. Prohibited Transactions include the disposition of a qualified mortgage (except where the disposition is "incident to" the foreclosure, default, or imminent default of the mortgage); or the receipt of any income from an asset that not a Qualified Mortgage or a Permitted Investment. 26 U.S.C. § 860F(a)(2)(B).

69. Prohibited Transactions are taxed in an amount 100% of the REMIC's net income from such prohibited transaction. 26 U.S.C. § 860F(a)(1).

70. Contributions (i.e. any "property" contributed to the REMIC, e.g., cash, mortgages, etc.). to the REMIC except the four (4) following exceptions are taxed at 100% of the contribution:

    a. Contributions to facilitate a "clean up call" (i.e. the redemption of a class of regular interest, when by reason of prior payments with respect to those interests the administrative costs associated with servicing that class outweigh the benefits of maintaining the class. Reg. § 1.860G-2(j)(1).

      b.     Any cash payment in the nature of a guarantee, such as payments to the REMIC under a surety bond, letter of credit or insurance policy.

      c.     Any cash contribution during the three month period after the start-up day; and

      d.     Any cash contribution to a qualified reserve fund made by a holder of a residual interest.

71.     Any violation of REMIC regulations will defeat the privileged tax status and will subject the REMIC to 100% taxation, plus penalties and interest.  These taxes and penalties are ultimately borne by the Certificateholders.

## F. The Present Case

### (a) The Merrill Lynch Mortgage Investment Trust ("MLMI Trust")

72.     In 1999, Merrill Lynch Mortgage Investors, Inc. acted as the underwriter of certain CMBS known as "MLMI 1999-C1," where UBS Warburg Securities, Inc. ("UBS"), Merrill Lynch, and Orix were the three Depositors, Orix acted as both Master Servicer and Special Servicer and Wells Fargo Bank Minnesota National Association ("Wells Fargo") as the Trustee.  The Trust elected to be treated as a "REMIC."  The securities which are the subject of this lawsuit will be referred to as "MLMI."  In the present case, the 10 year Certificates are all backed by 25 year commercial loans/mortgages, each with a balloon payment due at the end of 10 years, which coincides with the maturity of the Certificates.  The Certificateholders receive monthly interest payments and, by maturity date (the end of 10 years), will have recouped the total amount of the principal they invested.

73.     On or about October 2004, Plaintiff purchased $112,000 in MLMI Trust Certificates. Prior to such purchase, Plaintiff reviewed the Prospectus and thereafter the PSA in connection with the securities.  Under the term of the PSA, section 3.01(a) the Master and Special Servicers

-25-

... shall diligently service the Mortgage Loans ... with the same care, skill, prudence and diligence with which the Master Servicer or Special Servicer ... (1) services and administers similar mortgage loans for other third-party portfolios, giving due consideration to the customary and usual standards of practice of prudent institutional, commercial, .... lenders servicing their own mortgage loans, or (2) services and administers commercial, ... mortgage loans owned by the Master Servicer or Special Servicer, as the case may be, whichever standard is higher, and with a view to the maximization of timely recovery of principal and interest on a present value basis on the Mortgaged Loans or Specially Serviced Mortgage Loans, as applicable, and the best interest of the Trust and the Certificateholders, notwithstanding:

> (i)   any relationship that the Master Servicer or the Special Servicer, as the case may be, or any Affiliate hereof may have with the related Mortgagor, a Mortgage Loan Seller (including, without limitation, any Mortgage Loan Seller's repurchase obligation), or any other party to this Agreement;

> (ii)   the ownership of any Certificate by the Master Servicer or the Special servicer, as the case may be, or any affiliate thereof

> (iii)   the Master Servicer's or Special Servicer's, as the case may be, right to receive compensation for its services hereunder or with respect to any particular transaction; and

> (iv)   the Master Servicer's or Special Servicer's, as the case may be, owning or managing any other mortgage loans or mortgaged properties for third parties (the foregoing, collectively referred to as the "Servicing Standard").

74.   Unbeknownst to Plaintiff at the time it purchased its senior Certificates, the Orix Conspirators had already purchased MLMI "first loss" "B-Pieces" with a par value of $46,725,159 for the discounted price of $24,300,000. The following Chart demonstrates the class of certificates purchased by the Orix Conspirators, their par value, the percentage of par value actually paid by Orix, the actual investment of Orix in the B-Pieces, and the cumulative amounts of principal and

interest paid on the "B-Pieces." For the two lowest "B-Pieces" (K1 and K2) Orix paid 23 cents and

### Orix MLMI 6-Years Investment Summary

Revision 1, January 16, 2005

| | | | | Interest & Principal Distribution to B Rated Certificates Held by Orix & its Management | | | | | | |
| Class | Par $ | @% Par | Orix Invest $ | Month 1 Start | Month 12 Year 1 | Month 24 Year 2 | Month 36 Year 3 | Month 48 Year 4 | Month 60 Year 5 | Month 72 Year 6 | Cumulative Principals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| G | 9,898,000 | 70.95% | 6,700,000 | 64,653.33 | 835,058.88 | 1,531,966.48 | 2,281,269.09 | 3,018,212.55 | 3,741,771.06 | 4,450,833.68 | 3,382,009.10 |
| H | 20,735,000 | 59.34% | 12,000,000 | 138,233.33 | 1,785,414.09 | 3,275,451.13 | 4,877,512.32 | 6,453,148.81 | 8,000,167.34 | 9,516,192.65 | 7,230,971.20 |
| J | 2,963,000 | 54.51% | 1,600,000 | 19,753.33 | 255,132.96 | 468,058.99 | 696,989.10 | 922,145.16 | 1,143,211.76 | 1,359,849.47 | 1,033,294.80 |
| K | 13,330,159 | 33.20% | 4,000,000 | 88,867.73 | 1,147,810.64 | 2,105,728.69 | 3,135,865.05 | 4,148,613.44 | 5,143,163.86 | 6,117,789.30 | 4,648,661.48 |
| Total Investment | | | $24,300,000 | | | | Total Returns In 72 Months | | | 21,444,665.10 | 16,294,936.58 |

33 cents on the dollar.

75.    The purchase of Orix's "B-Pieces" in the various trusts were always investigated and
approved at various corporate levels. Specifically, the purchases were recommended by Weiner,
Thompson, C.E.O., and Y. Ono ("Ono"), Board member.    Exhibit "B," #OCM273651-57.

76.    As per Orix's and Wells Fargo's records, the aggregate principal amount of unpaid
loans in the MLMI pool was $591 Million at the inception of the Trust. In other words, the principal
amount of loans in the pool at its inception was $591 Million. Exhibit "C." According to the Trust's
Distribution Reports, borrowers are collectively making payments toward principal of approximately
$250,000 per month. Given that all of the loans in the pool are amortized over 25 years, the principal
paid each month is a very small percentage of the monthly payment made by the borrower. Thus,
without any foreclosures the aggregate principal amount of unpaid loans would have decreased by
approximately 18 Million dollars over the last 6 years ($250,000/month x 6 years = $18,000,000).
Currently, the aggregate amount of unpaid principal is $472 Million (Exhibit "D"), which means that
the Trust's principal amount of all unpaid loans in the pool has actually decreased $101 Million

dollars in the last six years ($591M - $472M - $18 M = $101), all due to the Orix Conspirators'
contrived foreclosures.

77.     The fact is that of Orix's and Wells Fargo's contrived and reckless foreclosures and

defaults, have eliminated 19 mortgaged loans for an approximately $101 Million loss of principal

to be distributed among the Certificateholders. Given the $101 Million loss in principal of the Trust,

all of the Orix Conspirators' $46,276,159 first loss "B-Pieces" should have been "junked." They

have not. Why? Because Orix continues to make "Principal and Interest" advances to the Trust in

order that (1) Orix's "B-Pieces" be paid interest and (2) so that Orix can maintain its "Controlling

Class" status.

78.     Orix's scheme of making Principal and Interest advances to the Trust in order to pay

its "B-Pieces" is nothing more than a pyramid scheme. As long as Orix keeps making the advances,

no one is the wiser. To date, Orix's initial $24,300,000 investment in MLMI "B-Pieces" investment

has received monthly principal and interest payments totaling $37,739,591.68. Orix has already

realized a 160% return, or a 70% profit on its investment, and it continues to receive monthly

payments. Unlike Plaintiff, Orix is receiving principal payments on its investment. (See Chart,

*supra* ¶ 74.)

79.     As stated before, all of Orix's "advances" to pay itself are recouped from the Trust

with interest before any of the other certificateholders see a dime in monthly payments. Eventually,

when the Orix Conspirators have decided that the profits on their "B-Pieces" are sufficiently obscene,

they will stop the "advances." At such time, there will not be sufficient moneys to make payments

to many of the "A" Certificateholders. Orix's and Wells Fargo's excuse for the failure is certain to



be "we had bad loans." Nonsense! The Orix Conspirators foreclosed on good and performing loans for their own benefit.

80.    In addition, unbeknownst to Plaintiff, Orix had created a secret partnership where key Orix employees such as Defendants Thompson, Weiner, Wurst and Dinan were given an interest (the "Partnership"). These same employees made decisions on behalf of Orix as (1) Servicer, (2) Special Servicer, (3) "B-Piece" Certificateholder, and (4) Fiduciaries to the other Certificateholders. Despite the inherent conflict of interests, and the duties set forth in Section 3.01(a) of the PSA, these key employees were given such an interest in the Partnership, that most of their compensation therein hinged entirely on Orix's revenues. This scheme was designed by the Orix defendants to entice Thompson, Weiner, Wurst and Dinan to maximize the profits of Orix, even if it meant violating their fiduciary duty to all other Certificateholders.

81.    Orix is paid a fee of 0.06199% of the loans it services and 0.25% of all loans in special servicing. Every time a loan was transferred from "servicing" to "special servicing," Thompson, Weiner, Wurst and Dinan made money. Thus, Orix is paid four times as much in fees for loans in "special servicing!"

82.    Each seizure and foreclosure nets Orix approximately two million dollars because on top of the fee, the Orix Conspirators also appropriate the cash flow of the seized building. After Orix foreclosed on the Arlington Apartments, approximately $362,609 in rental payments were made to Orix. Based upon information and belief, this amount never made it to the Trust. Exhibit "E." Every time a performing loan was foreclosed, Thompson, Weiner, Wurst and Dinan made money as Orix was paid a separate foreclosure fee in addition to its servicing fees. In addition, the Trustee also

received a fee upon each foreclosure, which explains why Wells Fargo has "looked the other way" as the Certificateholders were cheated out of performing loans.

83. The Partnership is the reason why the Orix Conspirators obtain artificially low appraisals on the targeted properties. After doing so, the Orix Conspirators initiate foreclosure proceedings alleging that the property owner has failed to maintain the property. After the property is seized, Orix appoints a Management Company ("Keeper") who allows the property to deteriorate in order to discourage other bidders at the sheriff's auction, and allow Orix to obtain the property for the least amount of money. Every time a foreclosed property was purchased by Orix and subsequently sold at a profit, Thompson, Weiner, Wurst and Dinan made money. This is exactly what happened with the Colonial Court Apartments (part of the Lee Hall Portfolio), which Orix bought for $900,000 at the foreclosure sale, and subsequently sold for $2.7 Million.

84. Every time Orix "advanced" money to the Trust to pay interest on its "B-Pieces," Thompson, Weiner, Wurst and Dinan make money through their Partnership interests! Every time Orix receives "interest" on any advances it makes to the Trust, Thompson, Weiner, Wurst and Dinan make money.

85. The Orix Conspirators never disclosed the existence of the Partnership or the identity of the partners. Plaintiffs never knew that the persons who were going to be making decisions with respect to their investments had a direct financial interest in all such decisions. This failure to disclose is particularly glaring given that Thompson, Weiner, Wurst and Dinan are all seasoned attorneys aware of the conflict of interest presented by the Partnership. The secret Orix Partnership was in existence at the time Plaintiff's purchased their certificates. Had Plaintiff known of its existence, Plaintiff would never have purchased its certificates.

-30-

86.    The industry average for loans in Special Servicing within a given CMBS pool is 2%. Currently, of the 106 loans in the MLMI pool, as Servicer Orix has transferred 19 loans (20% of the loans in the pool) to Orix as Special Servicer. Why? Because, Orix can make four times the fees for servicing the same loans by merely transferring them from "servicing" to "special servicing."

87.    As Special Servicer Orix has foreclosed on at least fifteen (15) loans in the pool, out



which at least ten (10) were making their monthly interest and principal payments. Some of Orix's "reasons" for the foreclosures on performing loans are set forth in Exhibit "F."

88.    For example, the First American Building loan was a performing loan that the Orix Conspirators targeted for foreclosure. Orix arbitrarily increased the monthly reserves for replacement (i.e. the amount of money Orix required the borrower to pay each month to cover repairs) from approximately $30,000 per month to $330,000 per month, knowing full well that the gross revenue from the building was $200,000 per month. It is no small wonder that the borrower

was unable to make its loan payments! The unfortunate borrower had a heart attack and died when Orix seized the property. The management company that Orix recommended be appointed to manage the property did such a miserable job that a major tenant decided to move out while the sale negotiations were ongoing. Orix sold the property without advising the buyer of the major tenant's decision to move out. Shortly after the new owner took possession of the property, the major tenant moved. The new owner had difficulties making loan payments after the major tenant moved out Orix as Special Servicer "helped" the new owner get back on its feet by again raising the monthly repair reserves to $400,000 per month. The new owner was not able to make loan payments plus $400,000 reserve payments per month. Orix seized the property and foreclosed again.

89.    Plaintiff is uncertain as to the facts surrounding the "Illegal Transfer/Supposed Embezzlement" of the Lee Hall Portfolio (consisting of four separate loans: Lee Hall, Colonial Court, River Drive and Norpoint Apartments). However, based on information and belief, the alleged "Contested Illegal Transfer" of the Sunset Hill Apartments involved a name change of the Apartments' Management Company. Also, based upon information and belief, the alleged "Illegal Transfer" in the Lee Hall Apartments involved one of the original Lee Hall partners' purchase of the other partner's share, all of which had taken place *prior to securitization*.

90.    Immediately after receiving notice that Orix was, so unjustly, seizing their properties for foreclosure, two borrowers actually died. Yet, Orix with the blessing of Wells Fargo continues its predatory practices totally unabashed. In fact, Wells Fargo is not opposed to predatory practices at all. At the annual meeting of the stockholders held on Tuesday, April 26, 2005, some of the shareholders requested (proposal 4) that the Board of Directors implement a policy mandating that Well Fargo not provide credit or other banking services to lenders that are engaged in predatory

lending. Incredibly, Richard M. Kovacevich ("Kovacevich"), Wells Fargo's Chairman, President and CEO recommended the stockholders to vote *Against* proposal 4! Exhibit "G."

91.    At the same annual meeting of the stockholders, and in light of the numerous instances where Wells Fargo's predatory conduct was the subject of regulatory investigations and lawsuits by governmental bodies, some of the shareholders called for a vote to request that the board conduct a special executive compensation review to study ways of linking executive compensation to successfully addressing predatory lending practices (proposal 5). The factors to be considered in the review included implementation of policies to prevent predatory lending; evaluation of sub-prime loans by *outside auditors* for compliance with laws and company policies; and reductions in predatory lending complaints filed with government bodies. Incredibly, Kovacevich recommended the stockholders to vote *Against* proposal 5! Id.

92.    While one would expect Orix's fees as "Servicer" to decrease as more loans are transferred to "Special Servicing", such is not the case. In fact, both have increased (see chart below). How can that be? If Orix transfers more and more loans from Servicing to Special Servicing, how can Orix's income from Special Servicing increase? It should not! Nevertheless, it does. See Chart p. 34.

93.    Each and every time the Orix Conspirators foreclose on a performing loan, the senior certificate holders lose money because the foreclosed borrower is no longer making principal and interest payments to the Trust. Furthermore, any moneys ever realized from such foreclosure are rarely if ever, sufficient to pay Orix's litigation expenses (which the Trusts reimburses with interest).





94.    The Villager Lodge/Peace Arch Loan ("Villager Lodge") in the PMAC Trust is a prime example of the foreclosure scheme at work.    Based on information and belief the Villager Lodge was a performing loan (i.e., making principal and interest payments) when the Orix Conspirators elected to foreclose.    According to Orix's own Realized Loss Form, after the "advances" and "additional expenses," the "benefit to the Trust was:

| | | |
|---|---|---|
| a. | Principal and Interest Advances | $150,325.98 |
| b. | Servicing Advances | 348,154.95 |
| c. | Interest on Servicing Advances | 13,018.51 |
| d. | Current Scheduled Interest Gross | 77,699.18 |
| e. | Additional Trust Expenses | <u>72,698.47</u> |
| | **Total Liquidation Expenses** | **$666,807.14** |

95.    The Villager Lodge sold for $522,000.    All of the monies from the sale went to the Orix Conspirators!    In fact, the Certificateholders had to pay Orix an additional $141,027.18 for the privilege of foreclosing on a performing loan.    Furthermore, based on information and belief, the Orix Conspirators continued to make advances even after Orix certified that the loan was not recoverable.

-34-

Why would any prudent Special Servicer ever continue to made advances on a loan in which it has issued a certificate of non-recoverability?  Money is the answer.  For their own aggrandizement , the Orix Conspirators destroyed the borrower, and reduced the principal of the Trust and the Certificateholders. The Trust and the Certificateholders lost a performing loan plus $666,807.14. The foregoing example shows how the Orix Conspirators always act in their  own best interest to the detriment of Plaintiff and all other Certificateholders.

96.     According to the sworn testimony of Robert Pettinato, Jr. ("Pettinato"), in 2002, Jim Thompson, Cliff Weiner and Michael Wurst, on at least two separate occasions requested that UBS purchase the Orix Conspirators' MLMI " B-Pieces" as well as those of another Trust, known as the PMAC.  The Orix Conspirators demanded that USB purchase all of Orix's "B-Pieces" at par value (a 300% profit to Orix) to avoid future repurchase litigation.  See deposition testimony of Robert Pettinato taken May 6, 2004, pp. 3-6, 12-15, 24-27 attached hereto as Exhibit "H," and on April 13, 2005, pp. 76-83, attached hereto as Exhibit "I."

97.     On one occasion, Thompson traveled to Atlantic City, New Jersey, to meet with UBS's Brian Harris to express that there were "problems" with many of the loans in the MLMI and PMAC Trusts for which UBS had been the Depositor.  In fact, many of the loans which Thompson characterized as "problem" loans were duly performing for the benefit of all Certificateholders. Thompson suggested that UBS's purchase of Orix's "B-Pieces" would resolve all issues with the problem loans.  Should UBS refuse to purchase the "B-Pieces" at par value, Thompson threatened that repurchase litigation as well as federal securities litigation would ensue.  See deposition of Brian Harris ("Harris"), dated June 3, 2004, pp. 19-32, attached hereto as Exhibit " J."  Orix's made such

threats with the intention of artificially inflating the price of its "B-Pieces" at the expense of all other Certificateholders.

98.     On another occasion, Weiner and Wurst made similar threats over the telephone to Pettinato and Bob Garner ("Garner"). In both instances, the Orix Conspirators demanded that UBS purchase Orix's "B-pieces" at par value or be faced with a lawsuit to be brought by Orix on behalf of the Trust. Wurst even boasted that such litigation would "shut down" UBS's business, as UBS would not be able to withstand the internal scrutiny in the industry.

99.     It is important to note that the Orix Conspirators also acted as Special Servicer and owned "B-Pieces" in PMAC, the other securitization which was also subjected to the Orix Conspirators' threats and acts of extortion. It is also important to remember that any Depositor knows that, where there is a determination of misrepresentations with respect to the loans it contributed to a pool, or where it repurchases loans, such Depositor would effectively be precluded from participating in future CMBS pools because its rating and credibility would be substantially compromised.

100.    In response to the Orix Conspirator's threats, Pettinato explained that if there were in fact problems with some of the loans in the Trusts, UBS's purchase of the Orix Conspirators' B-Pieces would not solve any of the problems of which they were complaining. If the loans were bad, repurchasing Orix's "B-Piece" would not benefit any of the senior Certificateholders, it would merely put a lot of money in Orix's pockets.

101.    The Orix Conspirators' threat was nothing but an attempted extortion of nearly $50 Million from UBS. The face value of the MLMI "B-Pieces" that the Orix Conspirators had purchased for a little over $24 Million was exactly $46,726,159. To date, Orix has not only recovered its initial

-36-

investment of $24.3 million, but has received additional distributions over the last six (6) years of $21,444,665 on its "B-Pieces," entirely as a result of the "advances" to the Trust, which the Trust repays with interest.)

102.    Unbelievably, in response to UBS's refusal to purchase the Orix Conspirators' "B-Pieces," Wurst suggested and requested that UBS re-purchase somewhere between 20 to 50 loans which had been "hand picked" by the Orix Conspirators. None of the "hand picked" loans were "problem loans." In fact, some were solid and performing notes such as Ramada Inn-South, Rockford Portfolio, South Wabash, Beckman-Coulter Building, Cresap Knoll & Yonkers Apartments, Evans Corporate Park, Executive Resorts Apartments, Hunt Valley Executive Plaza, INS Regional Office, Laidlaw Transit, Larpenteur Enterprise, Park Greenwood Apartments, Rockport Apartments, Cambridge Court Apartments, BestWestern University Inn, Best Western Regent Inn, Econolodge Pooler, Days Inn South, Comfort Inn-Byron and 150 Spring Street. See deposition testimony of Robert Rutherford, p. 210, attached hereto as Exhibit "K."

103.    According to Wurst, the repurchase was to be a "win/win" for all. UBS would profit because the selected loans were high coupon loans, and paid a higher interest rate than the prevailing interest rates being paid in the market. Thus, Wurst explained, "USB could resell each and every one of the loans at a profit." The Orix Conspirators would also benefit from the loan repurchase because it would increase the value of their "B-Pieces." Under Wurst's proposal, UBS and the Orix Conspirators were to benefit to the detriment of all other Certificateholders.

104.    Pettinato's deposition testimony explains that if the underlying mortgage loans which Wurst requested that UBS repurchase, carried a premium, then so did the certificates in the REMIC Trust, i.e., they are worth more than par value because of the high coupon on the underlying loans.

-37-

As Pettinato testified: "If loans were bought out of the trust at a hundred cents on the dollar, and that money was in turn paid to the bondholder, that hundred cents, for what that bondholder might have 110 cents in value, that bondholder just lost ten cents, or ten dollars, or ten million dollars, whatever the magnitude of the repurchase was. And we were not prepared to do that to the investors of those securitization [MLMI and PMAC]. And, that's why we thought it was improper." Exhibit "H," p.24-27. If Orix was able to cause UBS to repurchase these loans at 100 cents on the dollar, Orix would have a tremendous windfall profit in their ownership Certificates which they had purchased at deeply discounted rates. Clearly, Wurst, and the other Orix Conspirators had little, if any, regard for the fiduciary duties they owed to all the Certificateholders. They were more interested in their portion of the Partnership profits.

105.    When UBS refused to cave into the demands of the Orix Conspirators, Orix sued UBS in Cause No. 02-2849; *Wells Fargo Bank Minnesota, N.A., et al. v. UBS Warburg Real Estate Securities, Inc., et al.*; In the 192nd Judicial District Court of Dallas County, Texas (the "USB Lawsuit"), for alleged breaches of representations and warranties with respect to the loans UBS contributed as a Depositor to the MLMI and PMAC V Trusts. Orix alleged that 33 out of the 36 loans contributed to the Trust by UBS contained breaches of warranties. After the Certificateholders incurred millions of dollars in legal expenses to pursue the Orix conspirator's quest to increase the value of their "B-Pieces," Orix dismissed its claims against UBS with respect to all but 9 of the loans, 6 of which were *performing* loans!. This is especially appalling, given Thompson's testimony that he is unaware of any other servicer in the industry who requests the repurchase of performing loans. See deposition testimony of James Thompson, p. 81, attached hereto as Exhibit "L."

106.    It is important to note, that a REMIC Trust cannot sell or repurchase a "qualified mortgage" unless it is under imminent threat of foreclosure, without losing its tax-free status. Despite their knowledge of REMIC rules and regulations, that is exactly what Thompson, Weiner, Wurst and Dinan proposed to UBS. Obviously, Thompson, Weiner, Wurst and Dinan evidenced no regard for the interests of the Trust or the other Certificateholders when they made such a proposal.

107.    Under the threat of losing a favorable rating and not participating as a Depositor in future securitizations, UBS settled with the MLMI Trust and the PMAC Trust for $19.2 Million and $9 Million, respectively.

108.    Although Orix had sued *on behalf of the Trustee* in the UBS Lawsuit, the settlement monies were paid directly to Orix and not the Trust. In fact, after Orix recouped litigation advances and after Orix performed its voodoo accounting, all of the settlement proceeds were gobbled up by

**Distribution of Liquidation Proceeds**

| | | | |
|---|---|---|---|
| Collateral ID | | 8 | |
| Annex A ID | | PW-8703 | |
| Primary Servicer Loan Number: | | 296000038 | |
| | | | |
| **Liquidation Proceeds** | | | $  19,375,000.00 |
| | | | |
| **Recovery of Advances and interest thereon** | | | |
| less | P&I Advance | | 969,168.03 |
| less | Servicing Advances | | 4,643,417.74 |
| | Litigation expenses | 4,351,898.25 | |
| | Other Servicing Advances | 291,519.49 | |
| less | Interest at the Reimbursement Rate | | 316,277.31 |
| | To Servicer - Recovery of Advances and interest thereon | | 5,928,863.08 |
| | | | |
| | **Available Distribution Amount** | | 13,446,136.92 |
| | | | |
| | Accrued and unpaid interest on such Mortgage Loan at the related Mortgage Rate to but not including the Due Date in the Collection | | |
| less | Period of receipt | | 2,942,583.21 |
| less | Recovery of principal of such Mortgage Loan | | 10,503,553.71 |
| | **Remaining Liquidation Proceeds** | | 0.00 |

| | |
|---|---|
| Cumulative Litigation Expenses (to date) | 7,819,738.80 |
| Current Recovery of Litigation Expenses (from interest recoveries) | 2,647,795.69 |
| Current Recovery of Litigation Expenses (from Proceeds) | 4,351,898.25 |
| Outstanding Litigation Expenses | 820,044.86 |



Orix. The Certificateholders saw absolutely no return. Much to the contrary, on or about September 17, 2004, Orix notified all MLMI Certificateholders that the Certificateholders were being assessed $820,044.86 as additional fees on behalf of the Trust as a result of the UBS Lawsuit. In other words, Orix alleges to have spent approximately $20,020,044 in litigation expenses to recover absolutely nothing for the Certificateholders except an $820,044.86 bill!

109.    Similarly, last month alone, Orix billed the Trust legal expenses of $970,229 for the prosecution of the Trust's case against the bankrupt debtors of the Arlington Apartments. In the past month, nothing has happened in the litigation to justify an assessment of almost one million dollars to the Certificateholders of the MLMI Trust.

110.    Based upon information and belief, Orix has developed a litigation strategy where all costs associated with its Special Servicing are categorized as "legal expenses" and are, therefore, completely reimbursed by the Trust. This is contrary to the PSA's requirement that Orix pay all expenses incurred by Orix in connection with its Special Servicing activities.

111.    In the past year, the Orix Conspirators have made "advances" to the MLMI Trust in the amount of approximately $161 Million. The sole purpose of these "advances" was to (1) maintain their "Controlling Class Interest" in the Trust, thus permitting them to remain as Special Servicer and collect Special Servicing Fees, including foreclosure fees and interest on reserves for replacements paid by borrowers; (2) assure themselves payment of monthly interest and principal on their "B-Piece" investments in the Trust; and (3) have unlimited access to an intimidating litigation war chest.

112.    The PSA grants the Special Servicer the right to make advances to the Trust for shortfalls in principal and interest in contemplation of circumstances where loan payments from borrowers are a few days late (i.e. "the check is in the mail"), or where the scheduled payment dates

are due after the date the Servicer is to make monthly interest distributions to Certificateholders. The right to make advances to the Trust is not given as a means for self dealing and enrichment at the expense of the other Certificateholders.

113.    The MLMI Trust started out with 106 loans. Due to the "Rambo" litigation tactics of the Orix Conspirators and Wells Fargo, the Trust now has 87 loans; its default rate of 19% is unheard of in the industry which has a 2% to 3% default rate. This default rate is specially surprising, considering that the Orix Conspirators spent 4 months performing due diligence on the loans on the MLMI Trust prior to purchasing their "B-Pieces."

114.    As of December 2005, the available distribution amount collected (i.e., the amount collected from loans in one month, less the litigation expenses) has been reduced from $6,210,426 in January 2002, to a mere $3,578,454. Exhibit "M." Yet, despite the diminishing funds, the Orix Conspirators's *"B-Pieces" are still alive and receiving interest each month in the amount of $350,000* due entirely to the Orix Conspirators' "advances." Where there are insufficient funds from borrowers to pay the interest on the "B-Pieces" they are to be "junked" and the next lowest rated Certificates become the Controlling Class. Without the "Keep Our B-Alive" advances," there would not be sufficient monies to pay many of the senior Certificateholders, much less the "B-Piece" holders.

115.    Given the extraordinary number of foreclosures and the monthly Distribution Reports' revelation that the amount available for distribution to the Certificateholders is approximately one half of the original amount, the Orix Conspirator's first loss "B-Pieces" should have been defaulted (i.e. "junked") long ago. Instead, the Conspirators have devised a scheme whereby they "advance" monies to the Trust, so that they can pay themselves and, in this manner, the Orix Conspirators have converted their "first loss" "B-Pieces" into a "first profit" investment.

116.    As shown in the S.E.C. filing below, Orix has not made any type of 10-k disclosures to the Securities and Exchange Commission since 2001.  Obviously, Orix would rather face the penalty of a minimal fine from the S.E.C., than report what is really transpiring at Orix Capital Markets LLC.



**Wells Fargo's Involvement**

117.    Wells Fargo made fees as Trustee and benefitted along side Orix with respect to foreclosure fees.  The real reason it knowingly condoned the activities of the Orix Conspirators at the expense of the Certificateholders was that it "booked" "Master Servicing Rights" ("MSRs") as a $10,000,000,000 intangible asset.  Based on information and belief, to offset this asset, Wells Fargo issued additional stock or stock options to their President and CEO, Kovacevich, and to other key employees who were aware of the Orix Conspirator's schemes.  Kovacevich's income and stock option bonus for the year 2004 totaled $50 Million dollars.  Exhibit "N."

118.    Plaintiff has repeatedly advised Wells Fargo of its concerns regarding Orix's conduct and the mismanagement of the Trust.    On November 25, 2004, Tom Arjmandi ("Arjmandi"), President of Super Future Equities, wrote Wells Fargo regarding possible violations of the Servicing Standard.    On March 17, 2005, Arjmandi wrote Wells Fargo regarding inaccuracies in the Distribution Reports and requesting the list of MLMI Certificateholders.   On April 11, 2005, Arjmandi wrote Wells Fargo regarding the details of the UBS settlement.  The Trustee never produced any information or documents in response to Arjmandi's inquiries.

119.    Wells Fargo breached its fiduciary duty towards the Certificateholders by allowing and condoning the actions of the Orix conspirators.

120.    When convenient, Wells Fargo attempts to distance itself from the decisions made by Orix on behalf of the Trust, however, as Trustee, Wells Fargo is ultimately responsible for overseeing the conduct of Orix.  In fact, Wells Fargo does have a manual that deals with risk management in its trust business.  According to Michael G. Lugger, Wells Fargo's "Policies and Procedures" is a compilation of information used by Wells Fargo to manage its corporate trust business.  The Policies

and Procedures reflect, among other things, Well's Fargo decisions on how *best to manage for risk*, how to *administer and control* trust appointments and the level of oversight and control appropriate to the business. See Affidavit of Michael G. Lugger, ¶ ¶ 5-6, attached hereto as Exhibit "O."

### (b) The (the "FULBBA Trust")

121.    In 1998, Wachovia Bank, National Association sold certain multifamily and commercial mortgage loans, totaling in excess of $1.3 billion to First Union Commercial Mortgage Securities, Inc. ("First Union") who in turn deposited the loans into the FULBBA 1998-C2 ("FULBBA") pursuant to a PSA, where Wells Fargo acted as Trustee, First Union as the initial Master Servicer and Criimi Mae Services, L.P. ("Criimi Mae") as the initial Special Servicer.

122.    On July, 2005 Plaintiff purchased $52,000 in FULBBA Certificates. Prior to such purchase, Plaintiff reviewed the Prospectus and thereafter the PSA of the securities.

123.    On October 30, 1998, Orix purchased the Special Servicing rights from Criimi Mae, immediately subcontracted same back to Criimi Mae. Orix has no interest in acting as a Special Servicer because, at the time, it had yet to purchase a controlling interest in the "B-Pieces" of the FULBBA Trust.

124.    Unbeknownst to Plaintiff, in early 2000, after approximately four (4) months of extensive due diligence which included, reviewing First Union and Criimi Mae's files relating to the loans, internal reviews of all transaction documents, and conducting legal reviews of representations and warranties, Orix purchased the "B-Pieces" in the FULBBA Trust for approximately $141 million from Lehman Brothers at a significant discount. Some of the "B-Pieces" were purchased for as little as 25 cents on the dollar. At no time during its four month due diligence did Orix request the loan origination documents or any "internal credit analysis" from First Union or anyone else.

-44-

125.    On June 6, 2000 Orix contracted with First Union to acquire the master servicing rights. Orix then entered into a Sub-servicing contract with First Union whereby First Union was to act as custodian of the loan documents on behalf of Orix and was obligated to produce documents to Orix upon request.

126.    After Orix purchased the "B-Pieces", it terminated its contract with Criimi Mae and installed itself as Special Servicer of the FULBBA Trust.   Given Wells Fargo ineptitude or acquiescence, Orix now had control of the Trust.

127.    As Special Servicer, in March of 2002 (after creation of the Partnership), Orix requested that First Union produce certain loan origination documents for all the loans that First Union had contributed to the FULBBA Trust.  This was a very unusual request for two reasons: (1) a relatively low number of loans in the pool had been transferred to Special Servicing  and (2) Orix had already conducted extensive due diligence prior to its purchase of the "B-Pieces".

128.    The motive for the request would soon become apparent, and it had nothing to do with servicing the loans or protecting the interests of the Certificate holders in the Trust.  Just as in the UBS Lawsuit, Orix wanted the loan origination documents to scour them for possible "misrepresentations" in order to demand that the mortgage loan sellers repurchase certain loans in the pool at a significant profit to Orix.  All despite the adverse effect the demand would have on the other Certificateholders.

129.    Orix and Wells Fargo filed suit against Wachovia (f/k/a First Union).  After extensive litigation, Orix ultimately identified only two (2) loans, out of a pool of 664, for which it alleges losses related to missing documents and four (4) loans for which it alleges increases in servicing fees. Orix spent millions of the Trust's (i.e. Certificateholders') money prosecuting a case against

Wachovia and recovered nothing. Orix has placed the Trust on notice that it will likely seek reimbursement from the Trust for all litigation expenses, including attorney's fees incurred in the prosecution of the Wachovia.

130. Not to be discouraged, the Orix Conspirators set out to execute their contrived foreclosure campaign to line their pockets with Special Servicing and foreclosures fees, while making advances to the Trust to keep their "B-Pieces" alive. All at the expense of the Trust and Certificateholders, following the same pattern as previously described in connection with the MLMI Trust. After Orix became Special Servicer, the number of loans in Special Servicer increased exponentially, and so did the number of foreclosures. The chart below shows the number of foreclosures in the FULBBA Trust before and after Orix took over as Special Servicer (indicated by the vertical line):



131.   Although Orix always sues "on behalf of the Trust and all Certificateholders," nothing could be farther from the truth.  Orix's pattern of litigation against the mortgage loan sellers, is neither based nor limited to troubled loans; it consists of demanding the repurchase of any loan for which Orix can conceivably allege a technical misrepresentation or breach of warranty, even if the loan is fully performing.  The repurchase of performing loans can never be for the benefit of the Trust or the Certificateholders.  Orix demands the repurchase of performing loans so that it may realize a profit on its "B-Pieces" and could care less whether the Certificateholders lose future investment income.  Unbeknownst to the Certificateholders, and with the help of Wells Fargo, "Trustee," Orix is spending the assets of the Trust for its own benefit.

132.   Plaintiff became aware that the value of its certificates was greatly diminished due to Orix's and Wells Fargo's egregious and ongoing breaches of contractual and fiduciary obligations as the "Special Servicer" and "Trustee," respectively.

133.   As Special Servicer, Orix  has  engaged, and continues to engage, in a wasteful, baseless and self-serving campaign of litigation designed only to further its own financial interests at the expense of all other investors in the MLMI and FULBBA Trusts.  As a result, Orix has caused all other holders of beneficial interests in the Trusts to suffer substantial shortfalls in their interest payments from the fund and downgrades in the credit ratings of their certificates.  As Trustee, Wells Fargo has known of the malfeasance of Orix and has elected to "look the other" way provided monies keep entering the coffers of Wells Fargo.  The certificateholders will continue to suffer these losses if Orix and Wells Fargo are allowed to continue on their wrongful path.

## IV. DAMAGES

134.    Plaintiff invested $112,000 in Certificates in the MLMI Trust, and $52,000 in the

FULBBA Trust. Plaintiff's Certificates are now virtually worthless. Furthermore, Plaintiff cannot

sell its Certificates without full disclosure of the conduct of Orix and Wells Fargo as described above.

If Plaintiff does not make a full disclosure of all facts to any prospective purchaser, Plaintiff will have

violated securities laws and regulations; as have Orix, Wells Fargo and the Orix Conspirators.

135.    To date, the Orix Conspirators have spent in excess of $161 Million of the MLMI

Trust funds in the exclusive furtherance of their own interests and to the detriment of the Trust and

the other Certificateholders. The Trust has already reimbursed a substantial part of said sum to Orix.

Plaintiff, and all other Certificate holders are entitled to their proportionate share of such

reimbursement.

136.    In addition, although the Orix Conspirators' "B-Pieces" should have been "junked"

long ago, the Orix Conspirators have received $350,000 of the Trust's funds each month. Plaintiff

and all other Certificateholders are entitled of their proportional share of all interest payments made

to the Orix Conspirators' "B-Pieces" after the date on which such certificates should have been

"junked."

## VII. CAUSES OF ACTION

### A. Breach of Fiduciary Duty

137.    Paragraphs 1 through 136 are incorporated herein by reference and for all purposes as

if set out in full. The conduct of the Orix Conspirators and Wells Fargo, as outlined above, amounts

to a breach of the fiduciary duty each of them owed to the Trust and to the Certificateholders.

138.    Under the PSA, Orix agreed to assume the duties and responsibilities of Servicer and Special Servicer.  According the express terms of the PSA, Orix, as Servicer and Special Servicer, agreed to "diligently service and administer the Mortgage Loans which it is obligated to service pursuant to [the PSA] on behalf of the Trustee for the benefit of the Certificateholders.

139.    Orix agreed to service and administer "with the same care, skill, prudence and diligence" with which Orix;

    a.    services and administers similar mortgage loans for other third-party portfolios, giving due consideration to the customary and usual standards of practice of prudent institutional, commercial, multifamily and manufactured housing mortgage lenders servicing their own mortgaged loans, or

    b.    services and administers commercial, multifamily and manufactured housing mortgage loans owned by [Orix],

 -whichever standard is higher, notwithstanding the ownership of any Certificate by [Orix] or any affiliate thereof.

140.    A formal fiduciary relationship arises as a matter of law between Orix, in its capacity as Special Servicer and the Trust and Certificateholders, as a consequence of Orix's assumption of the administration, management and servicing of the mortgage loans on behalf of and for the benefit of the Trust and the Certificateholders.  Pursuant to the PSA, Orix had a duty to service, and special service the mortgaged loans in the best interest of the Trust and the Certificateholders without regard to Orix's ownership of any Certificates or the right to receive compensation for services with respect to any particular transaction.  Orix did nothing but ensure the value of its "B-Pieces" at the expense of the Trust and the Certificateholders.

141.    The Orix conspirators breached the Servicing Standard as well as their fiduciary, good faith and fair dealing, and/or reasonable care duties by, among other things:

a.      acting in their own economic self-interest to the detriment of the Certificateholders;

b.      making servicing decisions as investors rather than as an independent servicer;

c.      initiating and pursuing litigation without complying with Section 11.03 of the PSA;

d.      tendering performing loans or loans for which there is no projected loss for repurchase;

e.      demanding that loans be repurchased without a prior determination as to whether any of the alleged defaults had a material and adverse effect on any of the referenced loans;

f.      settling the repurchase loan litigation, pocketing the proceeds, and allowing the same loans they had claimed to be "a problem" to remain in the Trust;

g.      charging the Trust for litigation expenses incurred in connection with litigation which did not, and could not, have benefitted the Trust or the Certificateholders;

h.      imperiling the ratings of the Certificates, and the return to the Certificateholders, by pursuing their own economic self-interest without regard to the consequences to the Trust;

i.      transferring servicing functions and decisions, such as the identification of potential breaches or representations and warranties to outside counsel, at the expense of the Trust;

j.      restructuring Orix's servicing and special servicing departments in a manner which created an inherent conflict between Orix's interest as investor and their duties as a servicer;

k.      establishing a deferred compensation "partnership" for Orix's key employees that was so extreme that it created an innate structural bias among those employees by creating so large a personal stake that it rendered it impossible for said employees to make servicing decisions without regard to Orix's own investments;

l.      using the rights and claims of the Trust and other Certificateholders as negotiating leverage for its own enrichment by offering to trade the enforcement of those rights in exchange for the purchase of Orix's "B-Pieces";

       m.     suggesting that the depositors could actually make a profit by repurchasing the performing loans tendered by Orix, thereby conspiring to benefit each other at the expense of the Trust and the certificateholders;

       n.     the use of reckless litigation strategies, to pursue perceived loopholes in loan or deal documents, which presented high risks to the financial interest of the Trust and Certificateholders; and

       o.     advancing moneys to the Trust for the sole purpose of keeping their "B-Pieces" alive, and at an inflated price, at the expense of all other Certificateholders.

142.    The multiple lawsuits commenced by the Orix Conspirators were prosecuted, at the expense of and to the detriment of other Certificateholders, to avoid the economic risks the Orix Conspirators knowingly sought and assumed as an investors in the below-investment-grade "B-Pieces."

143.    Well Fargo, violated the fiduciary duty it owed to the Trust and the Certificateholders by "looking the other way," as Orix stole the Trust's and the Certificateholders' assets with advances designed to keep its "B-Pieces" alive and enormous litigation costs that yielded no benefit to the Trust.  As a result of Orix's and Wells Fargo's breach of fiduciary duty, Plaintiffs and other Certificateholders have suffered short falls in their interest payments and down grades in the ratings of their certificates.

144.    The conduct of the Orix Conspirators and Wells Fargo was a producing cause of Plaintiff's damages for which it now seeks relief.

145.    In addition, the Orix Conspirators and Wells Fargo profited extensively from their respective breaches.  Because the Orix Conspirators and Wells Fargo breached their fiduciary duties, each one of them is now obligated to disgorge all profits, included but not limited to all principal and

interest payments the "B-Piece" certificates after the date on which the Certificates should have been junked, all fees, revenues, compensation and bonuses.

146.    In addition, both Orix and Wells Fargo profited extensively from their respective breaches. Because Orix and Wells Fargo breached their fiduciary duties, each one of them is now obligated to disgorge all fees and other consideration received as Servicer/Special Servicer and Trustee, respectively.

147.    As fiduciaries, the Orix Conspirators and Wells Fargo should forfeit their ill gotten gains from the foregoing schemes. As fiduciaries, the Orix Conspirators and Wells Fargo should forfeit their ill gotten gains from the foregoing schemes.

148.    In addition, due to the "advances" and interest, Orix's "B-Piece" Certificates increased in value $20 million. As a fiduciary, Orix should be disgorged of any gains realized from the breach of its fiduciary obligations. Plaintiff, and all other Certificateholder are entitled to reimbursement of their proportionate share of the increase in value of Orix's "B-Pieces."

149.    In addition, due to the "advances" and interest, the Orix Conspirator's Partnership interests have increased in value. The Orix Conspirators owed a fiduciary duty to Plaintiff and all other Certificateholders; Plaintiff and all other Certificateholders are entitled to reimbursement of their proportionate share of the Partnership's profits.

150.    Plaintiff prays that this Court place a constructive trust for the benefit of all Certificateholders on all proceeds, funds, or property that the Orix Conspirators and Wells Fargo obtained as a result of the breach of their respective fiduciary obligations.

## B. Breach of Contract

151.    Paragraphs 1 through 136 are incorporated herein by reference and for all purposes as if set out in full.

152.    The PSA is a valid and binding contract enforceable in accordance with its terms. Furthermore, the PSA sets forth the duties and obligations thereto, all for the benefit of the Trust and the Certificateholders.  Plaintiff is a Certificate holder and a third-party beneficiary of the PSA.

153.    The Orix Conspirators have materially breached their obligations under the PSA by, among other things, violating the Servicing Standard.

154.    The Orix Conspirators exploited Orix's position as Special Servicer to advance their own interest as  "B-Piece" owners pursuing a wasteful litigation campaign, at the expense of the Certificate holders, to force the repurchase of mortgage loans without a prior determination as to whether any of the alleged defects had an adverse effect on the Trust.   Thereafter, the Orix Conspirators settled the litigation and left all allegedly defective mortgage loans within the Trust.

155.    If the alleged defects on the mortgaged loans to be repurchased *were not materially adverse*, the Orix conspirators breached the PSA by initiating such lawsuit.  If the alleged defects on the mortgaged loans to be repurchased *were materially adverse*, Orix breached the PSA by settling the lawsuit, pocketing the proceeds, and leaving the alleged defective loans in the Trust.

156.    As a direct result of Orix's breach of contract, the Certificateholders, including Plaintiff, have suffered shortfalls in their interest payments and downgrades in the ratings of their certificates.  Orix conduct is the producing cause of Plaintiff's and all Certificateholders' damages.

157.    By reason of the foregoing, the Trust and all Certificateholders have suffered damages in the amount of the Trust Funds that Orix squandered to advance actions not in the best interest of all Certificateholders.

## C.  Breach of Contract

158.    Paragraphs 1 through 136 are incorporated herein by reference and for all purposes as if set out in full.

159.    Orix has materially breached the PSA's requirement that Orix to pay all expenses incurred by Orix in connection with its servicing activities under the PSA.   Said breach is the producing cause of Plaintiff's damages.

160.    As direct a result of Orix's breach of contract, Plaintiff and all other Certificateholders have suffered shortfalls in their interest payments and downgrades in the ratings of their Certificates.

161.    By reason of the foregoing, Plaintiff, the Trust and all Certificateholders have suffered damages in the amount that Orix has taken from the Trust Fund to advance actions not in the best interest of all Certificateholders.

## D.  RICO

162.    Paragraphs 1 through 136 are incorporated herein by reference and for all purposes as if set out in full.

163.    Each one of the Orix Conspirators (Orix, Orix US, Thompson, Dinan, Wurst and Weiner) is a "person" as that term is defined in 18 U.S.C. § 1961(3).

164.    The MLMI Trust is an "enterprise," as that term is defined in 18 U.S.C. § 1961(4).

165.    Through a pattern of racketeering activity, the Orix conspirators have acquired an interest, and maintain a controlling interest, in the MLMI Trust, an enterprise that holds legal title to mortgages backing publicly traded securities.

166.    Having devised a scheme to defraud the Trust and the Certificateholders the Orix Conspirators made at least two telephone calls demanding that the Depositors purchase at face value the "B-Pieces" for the purpose of executing such scheme.  In addition, Wells Fargo and the Orix Conspirators sent or caused to be sent thousands of fraudulent Distribution Reports to the Certificate-holders via the U.S. mail service or electronic document transfer.

167.    More particularly, Wurst and Weiner telephoned Pettinato and Garner indicating that there may be "problems" with 20 to 50 loans in the MLMI and PMAC Trusts and suggesting that if UBS would purchase Orix's "B-Pieces" at face value the "problems" may go away.  On another occasion Dinan called Bob Stein to make the same or similar request.

168.    In addition, by mail and/or electronic document transfer, Orix and Wells Fargo sent or caused to be sent fraudulent Distribution Reports in the MLMI  Trust to the Certificateholders.  Specifically, the Distribution Reports did not accurately reflect the number of bankruptcies pending in the MLMI Trust.  As of December 30, 2005, Orix reported there were zero number of loans in bankruptcy.  The Orix Conspirators, and Wells Fargo know all too well, the statement is wholly inaccurate and misleading.  The Arlington apartments as well as the Lee Hall Portfolio (4 separate loans) filed for bankruptcy protection long before December 30, 2005.  The Distribution Report, sent to all Certificateholders intentionally misrepresented the number of bankruptcies in  order not to stir concerns among Certificateholders and to justify Orix's ongoing payment to its "B-Pieces."

169.    Plaintiff and all other Certificateholders have been damaged by the Orix Conspirators' ongoing control of the MLMI Trust through a pattern of racketeering activity.

170.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold the damages it has sustained and the cost of suit, including reasonable attorney's fees.

## VIII.  CLASS ACTION ALLEGATIONS

### A.    The MLMI Class

171.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the MLMI Class, which consists of all current and former Certificateholders of MLMI 1999 C-1 Trust. Excluded from the Class are defendants Orix Capital Markets, LLC, Orix US, Inc., the Partnership(s) in which the individual defendants were permitted to invest alongside with Orix entities, the individual defendants and members of their immediate families, former officers and directors of Defendants, any entity in which defendants had a controlling interest, and the legal representatives, heirs, successors, or assigns of any defendant.

172.    The MLMI Class Period  is from the time of the initial offering of the certificates in the MLMI Trust, which was September 1999, to the present.

173.    Plaintiff has attempted to determine the full size of the MLMI Class by making written inquires to the Trustee as to the identity of the other Certificateholders in the trust. Unfortunately, the Trustee has refused to provide such information, despite being required to do so in accordance with the PSA. Based on information and belief, the members of the Class are so numerous that joinder of all members is impracticable. Class members are located throughout the United States.

174.    Plaintiff's claims are typical of the claims of the members of the MLMI Class in that Plaintiff and each Class member purchased or otherwise obtained certificates in the MLMI Trust

during the Class Period and were subjected to defendants self dealings and the squandering, if not

stealing, of the Trusts assets by Orix and the Trustee.

175.    Plaintiff will fairly and adequately protect the interests of the members of the Class

and retained competent counsel who is familiar with the issues at hand and have educated themselves

over the past months as to the operations of defendants and the CMBS industry.

176.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy as joinder of all MLMI Class members is believed to be impractical.

In addition, the damages suffered by individual MLMI Class members may be relatively small, thus

the expense and burden of individual litigation makes it impossible for the Class members to seek

redress individually for the wrongs done to them.  There will be no difficulty in the management of

this action as a class action.

177.    Common questions of law and fact exist as to all members of the MLMI Class and

predominate over any questions affecting solely individual members of the MLMI Class.  The

questions of law and fact common to the MLMI Class include whether the Orix Conspirators and

Wells Fargo breached their fiduciary duties by:

    a.    acting in their own economic self-interest to the detriment of the Certificateholders;

    b.    making servicing decisions as  investors rather than an independent servicer;

    c.    initiating and pursuing litigation without complying with Section 11.03 of the PSA;

    d.    tendering performing loans or loans for which there is no projected loss for repurchase;

e.      demanding that loans be repurchases without a prior determination as to whether any of the alleged defaults had a material and adverse effect on any of the referenced loans;

f.      settling the demand to repurchase loans litigation, pocketing the proceeds, and allowing the same loans it had claimed to be "a problem" to remain in the Trust;

g.      charging the Trust for litigation expenses incurred in connection with litigation which did not and could not have benefitted the Trust or the Certificateholders;

h.      imperiling the ratings of the Certificates, and the return to the Certificateholders, by pursuing their own economic self-interest without regard to the consequences to the Trust;

i.      transferring servicing functions and decisions, such as the identification of potential breaches or representations and warranties to outside counsel, at the expenses of the Trust;

j.      restructuring Orix's servicing and special servicing departments in a manner which created an inherent conflict between Orix's interest as investor and its duties as a servicer;

k.      establishing a deferred compensation "partnership" for Orix's key employees that was so extreme that it created an innate structural bias among those employees by creating so large a personal stake that it rendered it impossible for said employees to make servicing decisions without regard to Orix's own investments;

l.      using the rights and claims of the Trust and other Certificateholders as negotiating leverage for their own enrichment by offering to trade the enforcement of those rights in exchange for the purchase of Orix's "B-Pieces";

m.      suggesting that the depositors could avoid repurchase demands by transferring servicing to a "sleepy shitty servicer";

n.      suggesting that the depositors could actually make a profit by repurchasing the performing loans tendered by Orix, thereby conspiring to benefit each other at the expense of the Trust and the certificateholders; and

o.      the use of reckless litigation strategies, to pursue perceived loopholes in loan or deal documents, which presented high risks to the financial interest of the Trust and Certificateholders.

p.      advancing moneys to the Trust for the sole purpose of keeping their "B-Pieces" alive, and at an inflated price, at the expense of all other Certificateholders.

q.      Whether defendants breached REMIC's regulations as well as their fiduciary duty to all certificateholders by requesting Depositors to repurchase "qualified mortgages" which were not in default or imminent threat of default;

r.      Whether Defendants committed RICO predicate acts of wire fraud in connection with their scheme to defraud the Trust, the Certificateholders, the Depositors, and the Internal Revenue Service;

s.      Whether Defendants had a scheme to defraud the Trust, the Certificateholders, the Depositors, and the Internal Revenue Service;

t.      Whether Defendants did, in fact defraud the Trust, the Certificateholders, the Depositors, and the Internal Revenue Service;

u.      Whether Defendants breached the PSA contract by suing depositors for the repurchase of alleged defective loans and thereafter settled the lawsuit, pocketed the proceeds and allowed the alleged "defective loans" to remain in the trust pool;

v.      Whether Orix breached the PSA contract by charging the expenses incurred from its activities as Special Servicer to the Trust;

178.    In each an every instance in which the Orix Conspirators filed suit against a Depositor or borrower, Wells Fargo has ratified the unscrupulous conduct of Orix.

179.    Orix has in fact brought suit on its behalf as a certificateholder against Depositors in the past. Based on information and belief, all such litigation expenses incurred by Orix in prosecuting claims on its own behalf, were paid for by the Trusts. Plaintiff has recently learned that on October 10, 2002, Orix "on its own and acting in its capacity as Servicer and Special Servicer" for the Trustee LaSalle Bank, National Association" filed suit against Defendants UBS Warburg, Inc., UBS Warburg Real Estate Securities, Inc., UBS PaineWebber, Inc. and PaineWebber Mortgage Acceptance Corporation V for alleged breaches of securities violations. Based upon information and belief, the Trust Certificateholders paid for the cost of Orix's lawsuit against UBS.

180.    All conditions precedent to the filing of this lawsuit have been met.

-59-

**B.    The FULBBA Class**

181.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the FULBBA Class, which consists of all current and former Certificateholders of FULBBA 1998 -C2 Trust. Excluded from the Class are defendants Orix Capital Markets, LLC, Orix US, Inc., the Partnership(s) in which the individual defendants were permitted to invest alongside with Orix entities, the individual defendants and members of their immediate families, former officers and directors of Defendants, any entity in which defendants had a controlling interest, and the legal representatives, heirs, successors, or assigns of any defendant.

182.    The FULBBA Class Period  is from the time of the initial offering of the certificates in the FULBBA Trust, which was mid 1998 to the present.

183.    Plaintiff has attempted to determine the full size of the FULBBA Class by making written inquires to the Trustee as to the identity of the other Certificateholders in the trust. Unfortunately, the Trustee has refused to provide such information, despite being required to do so in accordance with the PSA.  Based on information and belief, the members of the Class are so numerous that joinder of all members is impracticable.  Class members are located throughout the United States.

184.    Plaintiff's claims are typical of the claims of the members of the FULBBA Class in that Plaintiff and each Class member purchased or otherwise obtained certificates in the FULBBA Trust during the Class Period and were subjected to defendants self dealings and the squandering, if not stealing, of the Trusts assets by Orix and the Trustee.

185.    Plaintiff will fairly and adequately protect the interests of the members of the Class and retained competent counsel who is familiar with the issues at hand and have educated themselves over the past months as to the operations of defendants and the CMBS industry.

186.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy as  joinder of all FULBBA Class members is believed to be impractical.  In addition, the damages suffered by individual FULBBA Class members may be relatively small, thus the expense and burden of individual litigation makes it impossible for the Class members to seek redress individually for the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

187.    Common questions of law and fact exist as to all members of the FULBBA Class and predominate over any questions affecting solely individual members of the FULBBA Class.  The questions of law and fact common to the FULBBA Class include whether the Orix Conspirators and Wells Fargo breached their fiduciary duties by:

      a.     acting in their own economic self-interest to the detriment of the Certificateholders;

      b.     making servicing decisions as  investors rather than an independent servicer;

      c.     initiating and pursuing litigation without complying with Section 11.03 of the PSA;

      d.     tendering performing loans or loans for which there is no projected loss for repurchase;

      e.     demanding that loans be repurchases without a prior determination as to whether any of the alleged defaults had a material and adverse effect on any of the referenced loans;

      f.     settling the demand to repurchase loans litigation, pocketing the proceeds, and allowing the same loans it had claimed to be "a problem" to remain in the Trust;

g.      charging the Trust for litigation expenses incurred in connection with litigation which did not and could not have benefitted the Trust or the Certificateholders;

h.      imperiling the ratings of the Certificates, and the return to the Certificateholders, by pursuing their own economic self-interest without regard to the consequences to the Trust;

i.      transferring servicing functions and decisions, such as the identification of potential breaches or representations and warranties to outside counsel, at the expenses of the Trust;

j.      restructuring Orix's servicing and special servicing departments in a manner which created an inherent conflict between Orix's interest as investor and its duties as a servicer;

k.      establishing a deferred compensation "partnership" for Orix's key employees that was so extreme that it created an innate structural bias among those employees by creating so large a personal stake that it rendered it impossible for said employees to make servicing decisions without regard to Orix's own investments;

l.      using the rights and claims of the Trust and other Certificateholders as negotiating leverage for their own enrichment by offering to trade the enforcement of those rights in exchange for the purchase of Orix's "B-Pieces";

m.      suggesting that the depositors could avoid repurchase demands by transferring servicing to a "sleepy shitty servicer";

n.      suggesting that the depositors could actually make a profit by repurchasing the performing loans tendered by Orix, thereby conspiring to benefit each other at the expense of the Trust and the certificateholders; and

o.      the use of reckless litigation strategies, to pursue perceived loopholes in loan or deal documents, which presented high risks to the financial interest of the Trust and Certificateholders.

p.      advancing moneys to the Trust for the sole purpose of keeping their "B-Pieces" alive, and at an inflated price, at the expense of all other Certificateholders.

q.      Whether defendants breached REMIC's regulations as well as their fiduciary duty to all certificateholders by requesting Depositors to repurchase "qualified mortgages" which were not in default or imminent threat of default;

r.     Whether Defendants committed RICO predicate acts of wire fraud in connection with their scheme to defraud the Trust, the Certificateholders, the Depositors, and the Internal Revenue Service;

s.     Whether Defendants had a scheme to defraud the Trust, the Certificateholders, the Depositors, and the Internal Revenue Service;

t.     Whether Defendants did, in fact defraud the Trust, the Certificateholders, the Depositors, and the Internal Revenue Service;

u.     Whether Defendants breached the PSA contract by suing depositors for the repurchase of alleged defective loans and thereafter settled the lawsuit, pocketed the proceeds and allowed the alleged "defective loans" to remain in the trust pool;

v.     Whether Orix breached the PSA contract by charging the expenses incurred from its activities as Special Servicer to the Trust;

188.    In each an every instance in which the Orix Conspirators filed suit against a Depositor or borrower, Wells Fargo has ratified the unscrupulous conduct of Orix.

189.    Orix has in fact brought suit on its behalf as a certificateholder against Depositors in the past. Based on information and belief, all such litigation expenses incurred by Orix in prosecuting claims on its own behalf, were paid for by the Trusts. Plaintiff has recently learned that on October 10, 2002, Orix "on its own and acting in its capacity as Servicer and Special Servicer" for the Trustee LaSalle Bank, National Association" filed suit against Defendants UBS Warburg, Inc., UBS Warburg Real Estate Securities, Inc., UBS PaineWebber, Inc. and PaineWebber Mortgage Acceptance Corporation V for alleged breaches of securities violations. Based upon information and belief, the Trust Certificateholders paid for the cost of Orix's lawsuit against UBS.

190.    All conditions precedent to the filing of this lawsuit have been met.

-63-

## IX. INJUNCTIVE RELIEF

191.    Paragraphs 1 through 136  are incorporated herein by reference and for all purposes as if set out in full.

192.    Wells Fargo and Orix are continuing to unlawfully exploit their positions as Trustee and Special Servicer of the MLMI and FULBBA Trusts, to advance their own interests at the expense of the Certificateholders.

193.    Plaintiff and the Certificateholders have no adequate remedy at law.

194.    Orix continues to exploit its position as Special Servicer of the MLMI and FULBBA Trusts to advance its own interests as subordinate class Certificate holder and making "advances" to the Trust to keep alive its "B-Pieces" which should have disappeared long ago.

195.    Wells Fargo ass Trustee of the MLMI and FULBBA Trusts continues to accept the advances, and to repay same, plus interest, where it knows, or should know, that such advances benefit only the lowest class of Certificateholders who should have suffered the first losses.

196.    By reason of the foregoing the Trust Fund and all Certificateholders of the MLMI and FULBBA Trusts are entitled to an Order enjoining Orix from continuing to serve as the Special Servicer of the MLMI and FULBBA Trusts, enjoining Wells Fargo from continuing to serve as the Trustee of the MLMI and FULBBA Trusts, and appointing an interim Trustee and Special Servicer for the MLMI and FULBBA Trusts.

## X. DEMAND FOR JURY TRIAL

197.    Plaintiff respectfully demands a jury trial in this matter.

-64-

## XI. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer, and after final hearing of this cause, the Court enter judgment as follows:

1.    That Plaintiff, and the MLMI Class members and the FULBBA Class members recover their actual damages in the amounts found by the jury.

2.    That Plaintiff's damages be trebled pursuant to 18 U.S.C. § 1964(c).

3.    That Wells Fargo and Orix disgorge all fees, revenues, compensation and other consideration received from the MLMI and FULBBA Trusts, as Servicer/Special Servicer and Trustee, respectively.

4.    That Plaintiff recover litigation costs and reasonable attorney's fees incurred in the prosecution of the Rico and breach of contract claims.

5.    That Wells Fargo and Orix be enjoined from further activities in the MLMI and FULBBA Trusts as Trustee and Special Servicer, respectively.

6.    Plaintiff further prays for any such other and further relief, whether at law or in equity, to which it may be justly entitled.

Respectfully submitted,

BOHN & DUCLOUX

By: _____
    Jon P. Bohn
    State Bar No. 02564900
    806 Main, Suite 1411
    Houston, Texas 77002
    Telephone: (713) 522-2392
    Facsimile:  (713) 522-9015

**ATTORNEYS FOR PLAINTIFF**
**SUPER FUTURES EQUITIES**

-65-



**LAW OFFICES OF JULIE ZANUTTO**

by: 

Julie Zanutto
State Bar Number 22245470
900 Jackson Street, Suite 750
Dallas, Texas 75202
Telephone: (214) 747-2808
Facsimile: (214) 752-1484

**LOCAL COUNSEL FOR PLAINTIFF**

-66-